FILED

2008 Feb-26  AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DERITHA BASSHAM, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY; HARTFORD LIFE | ) | **Civil Action No. 06-S-630-NE** |
| GROUP INSURANCE | ) | |
| COMPANY; PPG INDUSTRIES, | ) | |
| INC.; and PPG INDUSTRIES, | ) | |
| INC. EMPLOYEE WELFARE | ) | |
| PLAN, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This court previously entered two memorandum opinions in this ERISA[1] case, narrowing the claims and dismissing certain defendants.[2]  This opinion addresses the final dispositive motion pending:  *i.e.*, the summary judgment motion filed by defendants Continental Casualty Company ("CNA") and Hartford Life Group Insurance Company ("Hartford").[3]  Both entities were joined as defendants because

---

[1] ERISA is the accepted acronym for the "Employee Retirement Income Security Act of 1974," 29 U.S.C. § 1001 *et seq*.

[2] Doc. nos. 20 and 21 (dismissing state law claims, striking jury demand, and granting summary judgment to plaintiff's employer as to her claim for benefits); doc. no. 55 (dismissing plaintiff's ERISA-based retaliation claim against her employer).

[3] Doc. no. 28.

of their involvement in insuring and administering the basic and supplemental long-term disability insurance policies at the heart of this case. Plaintiff, Deritha Bassham, claims her long-term disability benefits under those policies were wrongfully terminated, and she filed this lawsuit, in part, to collect what she believes is owed to her. CNA and Hartford deny Bassham's allegations, and seek judgment as a matter of law.[4]  For the reasons set forth below, genuine issues of material fact preclude the entry of judgment at this time.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[5]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[4] As counsel for Bassham notes, the PPG Industries, Inc. Employee Welfare Plan also remains a defendant to this case.  Although the Plan did not join in the motion for summary judgment filed by CNA and Hartford, the interests of all three of these defendants are so aligned that a decision in favor of the movants would logically resolve the case as to the Plan as well.

[5] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal

quotations and citation omitted) (bracketed alteration suppled). *See also Anderson*

*v. UNUM Provident Corp.*, 369 F.3d 1257, 1262 (11th Cir. 2004).

## II.  SUMMARY OF RELEVANT FACTS [6]

---

[6] ***Nota bene:***  in responding to Bassham's Statement of Additional Undisputed Facts, defendants lodge a number of hearsay and relevance objections. The court's recitation of the facts is limited to those deemed to be relevant, so there is no need to specifically address any relevancy objections. The hearsay objections are directed at several medical records and evaluative reports which are included in the Administrative Record. Without any elaboration, defendants state that these documents constitute hearsay and, therefore, cannot be considered by the court. But the standard of review in this case (outlined below) *obligates* the court to consider all documents in the Administrative Record, because those documents were before the claims administrator at the time the benefits decision was made. *See, e.g.*, *Scarpulla v. Bayer Corp. Disability Plan*, 514 F. Supp. 2d 1262, 1275 (N.D. Ala. 2007) (holding that, "in arbitrary and capricious review or heightened arbitrary and capricious review . . . the court must evaluate the administrator's decision based only on the administrative record") (citing, *e.g.*, *Paramore v. Delta Airlines*, 129 F.3d 1446, 1451 (11th Cir. 1997)). In reviewing the Administrative Record, the administrator was not bound by the Federal

A.      **Bassham's Employment Background and Medical History**

Prior to this lawsuit, Deritha Bassham worked for a number of years as a busbar operator at the airplane window and windshield manufacturing facility owned and operated by defendant PPG Industries, Inc., in Huntsville, Alabama.[7]  The parties do not explain exactly what duties Bassham performed in that position, but it is clear that the job was labor-intensive:  *e.g.*, it required Bassham to stand for five to eight hours every day; to walk, bend, twist, kneel, crouch, crawl, and reach above and below her shoulders; and to lift or carry between 26 and 50 pounds on a regular basis.[8]

In September 2000, while working in the busbar room, Bassham injured her lower back.[9]  She initially sought medical treatment from PPG's Occupational Health Physician, Dr. William Walley, who diagnosed her with a herniated disc at the L5/S1

---

Rules of Evidence.  *See Johnson v. Bellsouth Long Term Disability Plan for Non-Salaried Employees*, No. 05-CV-858-J-32TEM, 2006 WL 2092273, at * 15 (M.D. Fla. 2006) (citing *Karr v. National Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998); *Brown v. Board of Trustees of Building Services 32B-J Pension Fund*, 392 F. Supp. 2d 434, 446 (E.D.N.Y. 2005)).  Given that, the court obviously could not evaluate the administrator's decision in any meaningful manner if it was forced to exclude from consideration any documents in the Administrative Record that arguably do not pass muster under the Federal Rules of Evidence.  Defendants' hearsay objections are, therefore, overruled.

[7] *See, e.g.*, doc. no. 29, Statement of Undisputed Facts, ¶ 9.

[8] *Id*. at ¶ 18.

[9] *Id*. at ¶ 9.

region of her back.[10]  In December 2000, Dr. Walley referred Bassham to Dr. Larry

Parker, an orthopedic surgeon specializing in spinal surgery.[11]  After a preliminary

evaluation, Dr. Parker recommended non-surgical management and physical

therapy.[12]  During the ensuing eighteen months of conservative treatment, Bassham

repeatedly returned to Dr. Parker complaining of continued pain in her back and left

leg.[13]  In early 2001, after suggesting a home exercise program, Dr. Parker prescribed

a series of three epidural steroid injections.[14]  Subsequent to those injections, Dr.

Parker reported that Bassham was asymptomatic, and she was classified as having

achieved maximum medical improvement ("MMI") with a disability impairment

rating of 5% to the body as a whole.[15]

However, by early April of the following year, 2002, Bassham became unable

to discharge the duties of her position as a busbar operator, and she ceased work at

PPG.[16]  In June 2002, Dr. Parker performed a microdiskectomy surgical procedure at

---

[10] *Id*.  A herniated disc (also called a "herniated nucleus pulposus") is defined as "protrusion of the nucleus pulposus or anulus fibrosus of an intervertebral disk, which may impinge on nerve roots." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") 844 (30th ed. 2003). *See also* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY ("THE MERCK MANUAL") 1902 (18th ed. 2006).

[11] Doc. no. 29, Statement of Undisputed Facts, ¶ 10.

[12] Doc. no. 30, Ex. 2 (Administrative Record ("AR")) at 525.

[13] Doc. no. 29, Statement of Undisputed Facts, ¶ 10.

[14] AR at 525.

[15] *Id*.

[16] Doc. no. 29, Statement of Undisputed Facts, ¶ 7.

the left L5-S1 region of Bassham's back in an effort to relieve significant lumbar radiculopathy[17] — that is, he removed a major portion of the herniated disc using an operating microscope, hoping to reduce nerve root pain in the lower back.[18]  Although the procedure was at first deemed a success, by August of that year, 2002, Bassham was reporting nerve pain in her left leg; and in October, her lower back pain prompted Dr. Parker to recommend another surgical procedure:  posterior lumbar interbody fusion ("PLIF") with posterolateral fusion.[19]  Bassham submitted to the proposed surgery in December 2002.[20]  At a follow-up visit to Dr. Parker later that month, Bassham was diagnosed with post-laminectomy syndrome (*i.e.*, chronic back pain related to the surgery).[21]  Dr. Parker also noted that Bassham exhibited "some features of carpal tunnel [syndrome] which seem to have been exacerbated by her surgery," so he instructed her to wear a wrist splint at night.[22]

---

[17] *Id.* at ¶ 11; AR at 526, 593.

[18] *See* DORLAND'S at 477, 1069, 1151, 1562; THE MERCK MANUAL at 1902.

[19] *See*, *e.g.*, AR at 526, 456.  The parties do not describe the PILF procedure in any detail, but one source states that it "involves adding bone graft to an area of the spine to set up a biological response that causes the bone to grow between the two vertebral elements and thereby stop the motion at that segment."  http://www.spine-health.com/topics/surg/overview/lumbar/lumb07.html (last accessed Jan. 31, 2008).  That same website notes that "[a] PILF fusion is often supplemented by a simultaneous posterolateral spine fusion."  *Id.*

[20] Doc. no. 29, Statement of Undisputed Facts, ¶ 11; doc. no. 37, Statement of Additional Undisputed Facts, ¶ 3.

[21] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 4.  *See also* http://www.spinephysicians.org/dr0sdodetail.cfm?id=21 (last accessed Jan. 31, 2008).

[22] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 4 (quoting AR at 395).  *See also* THE MERCK MANUAL at 334 ("Carpal tunnel syndrome is compression of the median nerve as it

The next follow-up examination took place in February of 2003.[23]  Dr. Parker concluded that Bassham was doing well overall, but acknowledged that she was not pain-free.[24]  He planned to evaluate her again in eight weeks, at which time he anticipated proceeding to MMI, defining permanent restrictions, and establishing a time-line for returning her to work.[25]  As a part of this plan, Bassham was referred to a pain management specialist, Dr. Keith Anderson, for a Functional Capacities Evaluation ("FCE").[26]

After performing a FCE in June of 2003, Dr. Anderson determined that Bassham had achieved MMI, with a lingering impairment rating of 20% to the body as a whole.[27]  Despite this impairment rating, Dr. Anderson opined that Bassham was capable of performing light- to medium-duty work on a full-time basis.[28]

Accordingly, Dr. Parker released Bassham to return to work, effective July 7, 2003, with the stipulation that she was to adhere to the light- to medium-duty restrictions set forth in Dr. Anderson's FCE report.[29]  PPG's physician, Dr. Walley,

---

passes through the carpal tunnel in the wrist.").

[23] Doc. no. 29, Statement of Undisputed Facts, ¶ 12.

[24] *Id.*

[25] *Id.*

[26] *Id.* at ¶¶ 13, 14.

[27] *Id.* at ¶ 14.

[28] *Id.*

[29] *Id.* at ¶ 15.

endorsed Dr. Anderson's restrictions, but Bassham did not return to work at PPG.[30] The parties fail to fully articulate the reason or reasons for Bassham's failure to return to work, but it is undisputed that, in November 2003, a PPG representative indicated that PPG was unable to allow Bassham to return to duty in the same department due to the restrictions imposed by Dr. Anderson.[31]

Even after Dr. Parker released Bassham to return to work, effective July 7, 2003, under light- to medium-duty restrictions, she continued to consult with several physicians about her back pain and other medical problems.  On July 2, 2003, Bassham visited Dr. Barbara Bennett complaining of an increased heart rate.[32] Although Dr. Bennett noted a marked heart rate increase when Bassham rose to sit on the examining table, it appears she did not order any immediate treatment.[33] However, Dr. Bennett did refer Bassham to a neurologist, Dr. Belinda Savage-Edwards, for her reported headaches, neck pain, and neck muscle spasms.

Dr. Savage-Edwards performed several examinations,[34] culminating in a

---

[30] *See id.* at ¶¶ 7, 15.

[31] *See id.* at ¶ 23.

[32] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 12 (citing AR at 384).

[33] *See* AR at 384.  Just over one year later, on July 15, 2004, Bassham was seen by Dr. Maria Falcon for chest pain and palpitations following a stress test.  *See* doc. no. 37, Statement of Additional Undisputed Facts, ¶ 11.

[34] During early examinations, Dr. Savage-Edwards found Bassham to be suffering from, *inter alia*, migraine headaches, reduced upper arm reflexes, and reduced left ankle jerk.  *See* Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 6.

cervical myelogram (*i.e.*, a radiograph of the spinal cord near the neck) in late August 2003, which revealed "extradural defects at both C4-5 and C5-6."[35]   Dr. Savage-Edwards concluded that at the C5-6 level of Bassham's spine, "there is a definite central disc bulge present.  At C4-5, there is sclerosis [hardening of the tissue] seen and what may be an osteophyte [a bone outgrowth] involving the superior endplate of C5 causing impression upon the opacified thecal sac."[36]   Dr. Savage-Edwards relayed these findings in letter to Dr. Bennett, and also noted that "[e]lectrical studies demonstrated a mild, chronic C5-6 radiculopathy."[37]   On the other hand, she saw "no evidence of median nerve entrapment or carpal tunnel syndrome."[38]

After examining Bassham again in November 2003, Dr. Savage-Edwards noted musculoskeletal tender points at the cervical, occipital, and trapezius regions, and diagnosed her with cervicalgia (neck pain), brachial neuritis (pain extending across the nerves in the upper arm), and radiculitis (inflamation of the root of the spinal cord).[39]

Between Dr. Savage-Edwards's first evaluation of Bassham in August of 2003,

---

[35] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 1; AR at 159.  *See also* DORLAND'S at 337, 1210.

[36] AR at 158.  *See also*, *e.g.*, DORLAND'S at 1336, 1668.

[37] AR at 363.

[38] *Id.*

[39] *Id.* at 359.  *See also* doc. no. 37, Statement of Additional Undisputed Facts, ¶ 7; *See also*, *e.g.*, DORLAND'S at 1251, 1252.

and the second, in November of that same year, Bassham was referred to Dr. Eric Beck for chronic low back pain post-lumbar fusion.  Bassham saw Dr. Beck on October 20, 2003, at which time he noted a decreased pinprick reaction over the lateral right foot.[40]  Several months later, in April of 2004, Dr. Beck re-examined Bassham and found that she had "progressive numbness and pain in the low back and left leg," and pain and numbness "in the lateral aspect of the foot, where there was none previously."[41]  This time he specifically recorded "depressed left ankle jerk with decreased pinprick over the lateral left foot and leg."[42]  He ordered testing, which showed "no evidence of a left lumbar radiculopathy."[43]

Bassham was also examined by a physicatrist, Dr. Ted Edwards, in December of 2003.[44]  Dr. Edwards, like other doctors, tested Bassham's ankle jerk reflexes; he

---

[40] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 5; AR at 338.  Bassham also contends that Dr. Beck noted decreased reflexes in the knees and ankles.  *See* doc. no. 37, Statement of Additional Undisputed Facts, ¶ 5.  Defendants dispute this allegation.  *See* doc. no. 46, Response to Statement of Additional Undisputed Facts, ¶ 5.  The court has reviewed Dr. Beck's initial evaluation, which both sides cite in support of their respective positions, and cannot determine whether decreased reflexes were noted or not.  All Dr. Beck writes is:  "DTRs:  1+ at the knees, 0 at the ankles." AR at 339 (emphasis in original).  The court lacks the medical knowledge to decipher this shorthand, and the parties have not provided any enlightenment.

[41] AR at 336.

[42] *Id.*

[43] *Id.* at 335.  Again, "radiculopathy" means, roughly, irritation and/or inflammation of one or more nerve roots in the vicinity of the spinal column, causing radiating pain, often in the arms or legs.  *See* DORLAND'S at 1562; THE MERCK MANUAL at 1902.

[44] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 8; AR at 357.

concluded that the left ankle jerk was 0/4, while the right ankle measured 2/4.[45]  He also noted multiple tender points throughout Bassham's shoulders, neck, torso, and knees, and diagnosed her with cervical spondylosis without myelopathy, rotator cuff syndrome of shoulder and allied disorders, myalgia (muscle pain) and myositis (muscle inflammation), unspecified.[46]

In May 2004, Bassham saw Dr. Jesus Hernandez, a physician at Rheumatology Associates of North Alabama.[47]  Dr. Hernandez's written report of that evaluation indicates that Bassham's back pain symptoms "seem to have worsened" since her back surgery and fusion in 2002.[48]  Noting "[t]he presence of widespread pain (both above and below the diaphragm) associated with multiple tender points located in characteristic areas and a non-restorative sleep pattern associated with fatigue," Dr. Hernandez opined that "[t]his patient no doubt has fibromyalgia syndrome."[49]

---

[45] *See* AR at 357.

[46] Doc. no. 37, Statement of Additional Undisputed Facts, ¶¶ 9-10 (citing AR at 354, 357-58). Cervical spondylosis is "osteoarthritis of the cervical spine causing stenosis of the canal and sometimes cervical myelopathy from encroachment of bony osteoarthritic growths (osteophytes) on the lower cervical spinal cord, sometimes with involvement of lower cervical nerve roots (radiculomyelopathy)." THE MERCK MANUAL at 1912.  The rotator cuff is a "musculotendinous structure about the capsule of the shoulder joint," DORLAND'S at 445, that is susceptible to tendinitis and tearing.  *See* THE MERCK MANUAL at 2632.

[47] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 13 (citing AR at 327).

[48] AR at 327.

[49] *Id*. at 328.  *See also* doc. no. 37, Statement of Additional Undisputed Facts, ¶ 14. "Fibromyalgia is a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues.  Diagnosis is clinical.  Treatment includes exercise, local heat, and drugs for pain and sleep." THE MERCK

**B.**     **Bassham's Application for Disability Benefits**

**1.**     *The Relevant Disability Plan*

Due to her status as a PPG employee, Bassham was entitled to, and did, enroll in the company's Employee Welfare Plan.[50]   As a part of this plan — which is a qualified employee welfare benefit plan governed by ERISA — Bassham was eligible for benefits under a "basic" long-term disability benefits policy, and a "supplemental" long-term disability policy.[51]   As this court observed in a previous memorandum opinion, both of these policies were issued to PPG by defendant CNA following PPG's solicitation of bids from a variety of insurers.[52]   Defendant Hartford subsequently acquired CNA's group benefits business and now acts as the insurer and claims administrator for both policies.[53]

Under the "basic" long-term disability benefits policy, the available monthly benefit may be as high as 50% of the employee's base monthly salary, less deductions (or "offsets") for certain enumerated sources of income.[54]  Under the "supplemental" policy, the monthly benefit is 15% of the employee's base monthly salary, minus

---

MANUAL at 321.  *See also* DORLAND'S at 697 (defining "fibromyalgia" as "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points").

[50] Doc. no. 29, Statement of Undisputed Facts, ¶ 1.

[51] *Id.  See also*, *e.g.*, AR at 642.

[52] *See* doc. no. 20, at 12.

[53] *Id.*

[54] *See* Summary Plan Description ("SPD"), at 35.

offsets.[55]  Both policies obligate the insurer to "pay the Monthly Benefit for each

month of Total Disability which continues *after* the [365-day] Elimination Period,"

but note that "[t]he Monthly Benefit will not be payable *during* the Elimination

Period[.]"[56]  Likewise, both policies employ the same evolving definition of "total

disability."   During the overlapping elimination period and 24-month "insured

employee occupation period," "total disability" means that:

>    the Insured Employee, because of Injury or Sickness, is:
>        (1)  continuously unable to perform the substantial and material
>    duties of *his regular occupation*;
>        (2)   under the regular care of a licensed physician other than
>    himself; and
>        (3)  not gainfully employed in any occupation for which he is or
>    becomes qualified by education, training or experience.[57]

After the monthly benefit has been payable for 24 months, however, the definition of

"total disability" changes, meaning that:

>    because of Injury or Sickness, the Insured Employee is:
>        (1)  continuously unable to perform the substantial and material
>    duties of *any occupation for which he is reasonably qualified* by
>    education, training and experience without regard to the remuneration
>    available for the occupation; and
>        (2)   under the regular care of a licensed physician other than

---

[55] Doc. no. 30, Ex. 1, at 43, 50.

[56] *Id*. at 23, 55 (emphasis supplied).

[57] *Id*. at 8, 35 (emphasis supplied).  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 2.

himself.[58]

As used in both definitions, "injury" means "bodily injury caused by an accident which results, directly and independently of all other causes, in loss which begins while the Insured Employee's coverage is in force."[59]  "Sickness" means "sickness or disease causing loss which begins while the Insured Employee's coverage is in force,"[60] but under the supplemental policy, this excludes "any loss caused by or resulting from a pre-existing condition."[61]

The claims administrator role requires Hartford to "assess medical documentation to determine the severity and functionality of the claimed disability and to validate the claim."[62]  According to Hartford Appeals Specialist Janet Vogel Freeman, Hartford interprets the contracts to mean that

> [long-term disability] benefits are payable under both of the [policies] if, during the elimination period and "own occupation" period, an individual is, (1) continuously unable to perform the substantial and material duties of her regular occupation, (2) under the regular care of

---

[58] Doc. no. 30, Ex. 1, at 8, 35 (emphasis supplied).  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 3. Bassham notes that the SPD's recitation of the secondary definition of "total disability" differs slightly from the definitions in the policies themselves.  The SPD, however, explicitly provides that "the *actual Plan documents* governing the benefit programs in this Summary Plan Description. . . are controlling in the case of any ambiguity or inconsistency."   SPD at 2 (emphasis supplied).

[59] Doc. no. 30, Ex. 1, at 22, 50.

[60] *Id.*

[61] *Id.* at 50.

[62] Doc. no. 29, Statement of Undisputed Facts, ¶ 6; SPD at 42.

-14-

a licensed physician, and (3) not working for wages in any occupation for which she is or becomes qualified by education, training, or experience.  After benefits are payable for 24 months (the end of the "own occupation" period), the definition changes and [long-term disability] benefits are payable only if an individual is (1) continuously unable to engage in *any* occupation for which she is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed physician.[63]

## 2.    *"Own Occupation" Benefits Determination*

This court noted above that Dr. Parker cleared Bassham to return to work on or after July 7, 2003, under light- to medium-duty restrictions.  About two and one-half months after that release, Bassham submitted an application for long-term disability benefits to PPG.[64]  Hartford received the application on September 26, 2003.[65]  In support of her request for benefits, Bassham proffered her own "Employee Statement," the statements of her employer and physician, a Social Security denial letter, and miscellaneous documentation (*e.g.*, proof of salary, birth certificate).[66]  In her Employee Statement, Bassham outlined the physical restrictions imposed by Dr. Anderson, and alleged that those restrictions prevented her from being able to perform the duties of a busbar operator.[67]

---

[63] Doc. no. 29, Statement of Undisputed Facts, ¶ 5 (citations omitted) (bracketed alteration and emphasis supplied).

[64] AR at 642.

[65] Doc. no. 29, Statement of Undisputed Facts, ¶ 16.

[66] *Id*.

[67] *Id*. at ¶ 17.

On November 14, 2003, after receiving numerous additional medical records from PPG's worker's compensation carrier and plant physician, and being told by a PPG representative that the company could not accommodate Bassham in her previous department or position, Hartford approved "own occupation" benefits.[68] The award of benefits was made retroactive to April 8, 2003, with the period of time between Bassham's last day of work in April of 2002 and the date of retroactivity being used to satisfy the 365-day elimination period.[69] Hartford continued to pay Bassham "own occupation" benefits through April 8, 2005.[70]

### 3.    *"Any Occupation" Benefits Determination*

As noted in the preceding paragraph, Hartford approved payment of benefits to Bassham under the "own occupation" standard on November 14, 2003. Shortly after that action, Hartford moved on to begin examining whether Bassham could meet the "any occupation" standard that governs after benefits are paid for 24 months.[71] In late February 2004, Hartford Rehabilitation / Vocational Case Manager Raenell May interviewed Bassham in conjunction with a vocational assessment.[72] Bassham informed May that prolonged sitting and standing bothered her back; on the other

---

[68] *Id*. at ¶¶ 22-25.

[69] *Id*. at ¶ 25.

[70] *Id*. at ¶ 37.

[71] *Id*. at ¶ 26.

[72] *Id*. at ¶ 27.

hand, Bassham stated that she could use a home computer in 30 minute intervals, perform all household chores (at her own pace), shop for groceries, drive, walk, dress, and maintain her personal hygiene.[73]  May concluded that Bassham was "not able to perform the duties of [her own] occupation of Busbar Operator as it was performed, but [could] perform alternative work by the end of the Own Occupational period."[74] Specifically, May opined in a letter dated February 23, 2004 that Bassham was qualified and capable of working in the fields of small parts inspection, office management, and dispatching.[75]  Accordingly, May informed Bassham that benefits would cease at the end of the "own occupation" period.[76]

Nearly one year later, on January 4, 2005, May began attempting to re-establish contact with Bassham to perform a "functionality update."[77]  When the two finally spoke in late January, Bassham confirmed that she still could drive, walk, dress, tend to her personal hygiene, and use a home computer, but this time she said she could not perform household chores and was not doing her own grocery shopping.[78]  In mid-February 2005, Hartford asked Dr. Beck, Bassham's pain management physician,

---

[73] *Id.*

[74] AR at 62.

[75] *Id.  See also* doc. no. 29, Statement of Undisputed Facts, ¶¶ 28-29.

[76] AR at 62.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 28.

[77] Doc. no. 29, Statement of Undisputed Facts, ¶ 32.

[78] *Id.* at ¶ 33.  *See also* AR at 473.

to complete a  Functional Assessment Tool ("FAT") detailing the proper scope of Bassham's physical restrictions and relaying the current treatment plan.[79]  The central question on the FAT worksheet referenced the FCE performed by Dr. Anderson in June 2003, and summarized the conclusion as indicating that Bassham was not able to "lift more than 20 to 40 pounds from waist level, as well as reaching."[80]  Dr. Beck responded that he concurred with the restrictions as set forth in Dr. Anderson's FCE report — *i.e.*, he found light- to medium-duty work appropriate.[81]

After receiving this information, May completed an Assessment of Employability in late February 2005.[82]  May again found that Bassham was capable of working as an assembly line inspector or dispatcher, and also determined that Bassham could perform the duties of a production control clerk.[83]  Although this assessment accounted for Bassham's lifting and reaching limitations, it is not clear that May considered the impact of chronic pain on Bassham's ability to perform

---

[79] Doc. no. 29, Statement of Undisputed Facts, ¶ 34.

[80] *Id*. at ¶ 34.

[81] *Id*. ¶ 35.  Bassham takes exception to this conclusion.  Citing the actual FCE report — which, for reasons that have not been explained, was neither provided to Dr. Beck nor included in the Administrative Record — she notes that the lifting test was stopped prematurely due to increased heart rate.  According to her, then, the FCE truly shows an inability to lift more than 10 pounds. Doc. no. 37, Statement of Undisputed Facts, ¶¶ 34-35.  Defendants do not directly address this discrepancy; instead, they have moved to strike Bassham's reference to the actual FCE.  *See* doc. no. 47.

[82] Doc. no. 29, Statement of Undisputed Facts, ¶ 36.

[83] *Id*.

sustained work in any of these occupations.[84]  In any event, and based upon these findings and all other information then on file, Hartford reaffirmed its earlier determination that Bassham was not disabled from "any occupation," and informed her in a letter dated February 23, 2005 that benefits would cease as of April 7, 2005.[85]

### 4. *Bassham's Appeal of the "Any Occupation" Benefits Determination*

In the February 23rd letter, Hartford informed Bassham of her right to appeal the adverse decision regarding "any occupation" benefits.[86]  Shortly thereafter, Bassham exercised that right and formally requested an appeal.[87]  Over the next several months, Bassham's attorney supplied Hartford with numerous medical records, a Social Security Administration decision indicating that Bassham could not engage in gainful employment, and a separate vocational evaluation initially prepared for use in conjunction with a collateral dispute concerning Bassham's workers' compensation benefits.[88]

---

[84] *See generally* AR at 475-76.

[85] Doc. no. 29, Statement of Undisputed Facts, ¶ 37.

[86] *Id*.

[87] *Id*. at ¶ 38.

[88] *Id*. at ¶¶ 40, 42-44, 46.  ***Nota bene:*** upon receiving Bassham's letter requesting an appeal, Hartford informed her that her appeal would be submitted for decision on the *earlier* of two dates: the date Hartford received notice from her that all information had been tendered for review; or August 22, 2005.  *Id*. at ¶ 39.  Bassham began submitting information for review on April 5, 2005, but continued forwarding documents even after the expiration of the August 22 deadline.  *See id*. at ¶¶ 40-47; AR at 119.  Nevertheless, documents before the court indicate that all submissions were considered by Hartford.  *See* AR at 97-98, 104-105, 110.

Although the medical records are too numerous and divergent to summarize in one sentence , it is apparently undisputed that Bassham never provided Hartford with any medical documentation tending to contradict the light- to medium-duty work restrictions first imposed by Dr. Anderson in June 2003, and later endorsed by Dr. Beck.[89]  On the other hand, both the Social Security Administration determination, and the separate vocational evaluation support Bassham's claim of total and complete disability.[90]  The Social Security decision, dated October 24, 2004, rests upon the Administrative Law Judge's conclusion that "[t]he claimant cannot perform full-time, competitive work on a sustained basis at *any* exertional level."[91]  The vocational examination was performed by Anne Herrington Darnell, a licensed professional counselor.  In a written report issued on August 23, 2005, Darnell concluded that Bassham "has a Vocational Disability Rating and Loss of Earning Capacity of 100%."[92]  Stated slightly differently, Darnell opined that Bassham "will be unable to perform any jobs in her past relevant work history," and also "has a significant lack of transferable skills to occupations compatible with the restrictions [outlined in the report]."[93]  Thus, she was considered by Darnell to be "permanently and totally

---

[89] Doc. no. 29, Statement of Undisputed Facts, ¶ 49.

[90] *See* doc. no. 37, Statement of Additional Undisputed Facts, ¶ 19.

[91] AR at 324 (emphasis supplied).

[92] *Id*. at 154.

[93] *Id*.

disabled to compete for jobs in the open and competitive labor market."[94]

In late September 2005, Hartford notified Bassham that her file — which included the Social Security determination and vocational evaluation discussed above — had been referred to an orthopedic surgeon, Dr. Robert Pick, for independent medical review.[95]  Dr. Pick was asked to review Bassham's medical condition and her occupational functioning level.[96]  His written analysis, which is reproduced in the Administrative Record, is divided into two essential parts.  The first section contains very brief summaries of the medical records Dr. Pick considered, with special emphasis on the conclusions reached by Bassham's treating physicians.[97]  In the succeeding section, Dr. Pick records his opinion as to Bassham's medical condition and functionality:  that is, "Ms. Bassham can engage in light to medium level work activities on a full-time basis."[98]  Although Dr. Pick did not expound at length upon the basis for his conclusion, he did provide the following highlights:

> The only significant finding is L5-S1 diskectomy [surgery] on June 21, 2002, and [posterior lumbar interbody] fusion [surgery] on December 13, 2002.  Although one physician indicated asymmetric ankle reflexes [following those procedures], none of the other physicians of record has validated this finding in their multiple medical reports.

---

[94] *Id*. at 155.

[95] Doc. no. 29, Statement of Undisputed Facts, ¶ 45.

[96] *See* AR at 108.

[97] *See id.* at 98-101.

[98] *See id.* at 102-103.

Additionally, the documents reflect Ms. Bassham to be obese, and that issue does not seem to have been addressed by any of the physicians of record.

. . . .

The outcome of surgery has been described as satisfactory without any postoperative complications or objective residuals. Based on the fact that she did undergo two back operations, she is precluded from engaging in heavy work activities as well as in the maximum medium level work activities, which require moderate lifting on a frequent basis. However, none of the physicians of record has validated an orthopedic/musculoskeletal basis that precludes Ms. Bassham from engaging in the light to medium level work category on a full-time basis. This is from the time of Dr. Anderson's evaluation of Ms. Bassham, virtually 2.5 years ago — June 20, 2003, to the present.[99]

Relying in part on Dr. Pick's assessment, and in part on Hartford's own internal review of the Administrative Record, Hartford Appeal Specialist Janet Vogel Freeman upheld the decision to discontinue benefits by letter dated November 15, 2005.[100] She stated her reasoning as follows:

In order to make a determination of disability statute and assess the ability to perform the essential functions of an occupation, specific medical information is required from the attending physician and/or other medical providers. Addressing the question of disability requires a concise understanding of the claimant's occupational functioning. In Ms. Bassham's case, her physician, Dr. Beck, indicated via the Functional Assessment Tool dated February 18, 2005 that the restrictions outlined by Dr. Anderson in the June 20, 2003 Functional

---

[99] *Id*. at 102-103 (paragraph structure altered) (bracketed text supplied). *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 48.

[100] AR at 104, 108-109. *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 50.

Capacities Evaluation continued to be appropriate. Based on the restrictions indicated in the June 20, 2003 Functional Capacities Evaluation, we identified three occupations Ms. Bassham could perform based on her education, training and experience. We did not receive any medical documentation on appeal disputing the restrictions indicated in the June, 2003 Functional Capacities Evaluation performed by Dr. Anderson nor any medical documentation disputing Dr. Beck's opinion in February, 2005 that the restrictions noted in the June, 2003 Functional Assessment Tool continued to be appropriate. In addition, reviewing physician Dr. Pick also agreed that Ms. Bassham was not precluding [*sic*] from engaging in light to medium level work on a full-time basis.

Therefore, based on the contractual provisions of the PPG Industries, Inc. Long Term Disability policy and the documentation contained in Ms. Bassham's claim file, taken as a whole, our determination remains that the medical and vocational information submitted does not support that her condition was of such a severity that she would have been unable to continuously perform the substantial and material duties of any occupation for which she was reasonably qualified by education, training and experience as of April 8, 2005. Although [Bassham] did provide a vocational assessment on appeal, our vocational manager previously reviewed Ms. Bassham's file using the same medical and vocational criteria and identified three occupations she would qualify for based on her education, training and work experience and which would be within the restrictions and limitations provided by her physician.[101]

Vogel indicated at the conclusion of her letter that no further internal review was available.[102] Bassham then brought this action seeking judicial review pursuant to 29 U.S.C. § 1132(a)(1)(B).

## III. DISCUSSION

---

[101] AR at 108-109.

[102] *See id.* at 109.

A.     **The ERISA Framework**

As a threshold matter, the court must determine the appropriate standard for reviewing Hartford's decision to terminate Bassham's benefits, because ERISA itself does not specify the standard applicable to the decisions of claims administrators or other fiduciaries.  *See*, *e.g.*, *Doyle v. Liberty Life Assurance Co.*, 511 F.3d 1336, 1339-40 (11th Cir. 2008); *Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Id.* at 115. Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards for reviewing the decisions of a claims administrator:  (1) *de novo* where the plan does not grant the administrator discretion to determine a claimant's eligibility for benefits; (2) arbitrary and capricious where the plan does grant the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests.  *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997).

This court previously determined that, even though all plan documents

designate PPG Industries as the plan administrator, and endow it with discretionary authority to interpret the policies and make benefits determinations, PPG validly delegated that authority to CNA (and, derivatively, to Hartford).[103] Because CNA and Hartford also insure the policies at issue,[104] it is clear that they operate under a conflict of interests. *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1568 (11th Cir. 1990) (holding that "a strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims"); *Fick v. Metropolitan Life Insurance Co.*, 347 F. Supp. 2d 1271, 1285 (S.D. Fla. 2004) ("Under Eleventh Circuit authority, the plaintiff need not prove that the defendant's self-interest was *in fact* a motivating factor in the decision to deny benefits [in order to trigger heightened review].") (emphasis and bracketed text supplied).   Accordingly, the heightened arbitrary and capricious standard governs review of Hartford's decision to terminate Bassham's benefits. *See Doyle*, 511 F.3d at 1342 (holding, somewhat begrudgingly, that "the heightened standard applies to an administrator's benefits-denial decision based on factual

---

[103] *See* doc. no. 20, at 28 n.55; *id*. at 32.

[104] Doc. no. 37, Statement of Additional Undisputed Facts, ¶ 24.  Again, defendants object to this statement of undisputed fact as "irrelevant."  *See* doc. no. 46, Response to Statement of Additional Undisputed Facts, ¶ 24.  Obviously, given the considerations that must be taken into account in determining the proper standard of review, this fact is *anything* but irrelevant, and defendants appear to acknowledge as much in the argument section of their reply brief.  *See* doc. no. 46, at 13-14.

determinations, as well as decisions based on plan interpretations").

The applicability of the heightened arbitrary and capricious standard does not mean, however, that the conflict of interests is the court's sole (or even primary) focus. Instead, the court must first determine — on *de novo* review — "whether the claims administrator's decision is 'wrong' (i.e., the court disagrees with the administrator's decision)." *Id.* at 1340 (citation omitted). Given the nature of *de novo* review, the court is obliged at this stage to consider all the evidence in the administrative record *plus* "[relevant] factual opinions and evidence bearing on the claimant's entitlement to benefits that were not part of the administrative record at the time the administrator denied coverage." *Wise v. Hartford Life & Accident Insurance Co.*, 360 F. Supp. 2d 1310, 1325 (N.D. Ga. 2005) (*Wise I*) (citing *Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989) (concluding that limiting review "to only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a de novo review")). *See also Kirwan v. Marriot Corp.*, 10 F.3d 784, 789 (11th Cir. 1994) ("In this Circuit, a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination.").

Only if this court deems Hartford's benefits determination to have been "wrong" following *de novo* review must the court proceed further with the analysis.

*See*, *e.g.*, *Freling v. Reliance Standard Life Insurance Co.*, 315 F. Supp. 2d 1277, 1286 (S.D. Fla. 2004) ("[A] court need only consider whether the administrator's decision was 'tainted by self-interest,' if it first finds that the administrator's determination is wrong.") (citation omitted).   Simply put, if Hartford correctly concluded that Bassham was not entitled to a continuation of disability benefits, the inquiry is at an end, and summary judgment is due to be granted in defendants' favor.

However, "[i]f the administrator's decision is 'de novo wrong' and he [or it] was vested with discretion in reviewing claims, then [the court must] determine whether 'reasonable' grounds supported [the decision]."   *Doyle*, 511 F.3d at 1340 (emphasis and citation omitted) (bracketed text supplied).   This stage of the review process is governed by "the more deferential arbitrary and capricious standard."   *Id.* An administrator's *incorrect* decision is not *arbitrary and capricious* if it is "reasonable":  *i.e.*, if "there was a reasonable basis for the decision, based upon the facts known to the administrator *at the time the decision was made*."   *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989) (emphasis supplied).[105]

---

[105] Thus, normally at this stage the court should not permit either party to supplement the administrative record with evidence that was not presented to the administrator in the course of the internal review process.  *See Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) ("Should [the beneficiary] wish to present additional information that might affect the determination of eligibility for benefits, the proper course would be to remand to [the administrator] for a new determination.") (quoting *Jett*, 890 F.2d at 1140) (bracketed alterations in original).  *Cf. Levinson*

Where there are reasonable grounds for the erroneous decision, but the administrator operated under a conflict of interests, the court must apply "heightened arbitrary and capricious review." *Doyle*, 511 F.3d at 1340 (citation omitted).  Under this standard, the burden of proof shifts from the claimant to the claims administrator, who must then affirmatively establish that its decision was not "tainted by self-interest." *HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 994-95 (11th Cir. 2001) (internal citations omitted).   "Should the administrator meet this burden, the plaintiff can then prevail only if he [or she] demonstrates that the decision was arbitrary and capricious by 'other measures.'" *Wise I*, 360 F. Supp. 2d at 1323 (quoting *HCA*, 240 F.3d at 995).

## B.     Step One:  Was Hartford's Decision "Wrong"?

Before delving into an analysis of whether Hartford correctly concluded that Bassham could not meet the relevant definition of "total disability," the court pauses to explicitly state that Hartford properly *interpreted* this definition as requiring proof that:  (1) Bassham was continuously unable to perform the substantial and material duties of any occupation for which she was reasonably qualified by education, training, and experience, without regard to the remuneration available for the

---

*v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001) (upholding denial of administrator's request for remand where the administrator "had more than adequate opportunities to establish an administrative record containing evidence contradicting [claimant's] evidence").

occupation; and (2) that she was under the regular care of a licensed physician other than herself.[106]

With that much established, the question then becomes whether Hartford properly *applied* that definition to the facts at hand.  *See, e.g., Freling*, 315 F. Supp. 2d at 1287.  Stated slightly differently, the court must ask if there is a genuine issue of material fact with respect to whether Hartford's determination that Bassham *could* perform the substantial and material duties of at least one occupation for which she was qualified by education, training, or prior experience was "wrong."  *See Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276, 1286 (11th Cir. 2003) (explaining that even in ERISA disability benefits cases, a material conflict in the evidence obligates the court to deny summary judgment and proceed to a bench trial).

### 1.    *The Work Restrictions*

As outlined above, five physicians — Dr. Anderson, Dr. Parker, Dr. Walley, Dr. Beck, and Dr. Pick — independently concluded that light- to medium-duty work restrictions were sufficiently protective of Bassham's health.  These restrictions were originally formulated following the FCE that was administered to Bassham on June 20, 2003.  Courts have consistently recognized that "[a] functional capacity evaluation is the best means of assessing an individual's functional level."  *Fick*, 347

---

[106] Doc. no. 30, Ex. 1, at 8, 35; doc. no. 29, Statement of Undisputed Facts, ¶ 3.

F. Supp. 2d at 1280 (citing *Lake v. Hartford Life & Accident Insurance Co.*, 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004)).  *See also Wise v. Hartford Life & Accident Insurance Co.*, 403 F. Supp. 2d 1266, 1276-77 (N.D. Ga. 2005) (*Wise II*) (crediting the results of an FCE, but acknowledging that "a one-day evaluation is not without its limitations"); *Sejdic v. Group Long-Term Disability Plan for Employees of Homeside Lending*, *Inc.*, 348 F. Supp. 2d 1313, 1316, 1318-19 (M.D. Fla. 2004) (placing great reliance on the results of two FCEs in rejecting plaintiff's claim for benefits).

During the FCE administered to Bassham by Dr. Keith Anderson during June of 2003, she was asked to perform a wide variety of physical tasks.  One particular component of the FCE was a battery of lifting exercises, which required Bassham to attempt to lift various amounts of weight from floor to knuckle, knuckle to shoulder, and floor to shoulder.[107]  A review of the actual written FCE reveals that the floor to knuckle lift exercise was prematurely discontinued because Bassham's heart rate consistently increased above the recommended level when she lifted 10 or 20 pounds.[108]  Moreover, the floor to shoulder lift exercise is denominated "incomplete" in the actual FCE report.[109]  As noted above, however, the written FCE was for some

---

[107] *See* AR at 524, 531.

[108] *See* doc. no. 40, Ex. 1, at 60.

[109] *See id.*

reason not included in the Administrative Record.[110]  Instead, Hartford was provided with a letter from Dr. Anderson in which he summarized the conclusions he drew from the FCE.[111]  Without mentioning that some lifting exercises were terminated prematurely, or the apparent cardiac concerns that led to early termination of those exercises, Dr. Anderson wrote that Bassham "lifted from floor to knuckle 20 pounds[,] placing her in the frequent medium 11-25-pound lifting category."[112]  Based on this, Dr. Anderson established relatively permissive floor to knuckle lifting restrictions: *i.e.*, "occasional 40 pounds and frequent 20 pounds."[113]  His other lifting restrictions were roughly within that same range.[114]

After reviewing either the actual FCE or Dr. Anderson's summary — and the record is not clear on this point — Bassham's orthopedic surgeon, Dr. Parker, released her to return to work, effective July 7, 2003, "under the restrictions of the Functional Capacity Evaluation."[115]  PPG's physician, Dr. Walley, evaluated Bassham

---

[110]  Defendants have filed a motion to strike this report, arguing that the court's review is limited to the Administrative Record.  Doc. no. 47.  As outlined above, however, at the *de novo* stage of review, the court is not limited to the documents in the Administrative Record.  *See*, *e.g.*, *Kirwan*, 10 F.3d at 789; *Moon*, 888 F.2d at 89; *Wise I*, 360 F. Supp. 2d at 1325.  Accordingly, defendants' motion to strike will be denied.

[111]  *See* AR at 523-532.

[112]  *Id*. at 531.

[113]  *Id*. at 524.

[114]  *See id*.

[115]  *Id*. at 518.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 15.

a few days later, and also concurred with these restrictions.[116]  In the notation by which he conveyed his concurring opinion, Dr. Walley indicated that he was aware of the premature termination of the lifting test due to Bassham's increased heart rate.[117]  This knowledge evidently did not change his mind as to the reliability of the results, however, or the propriety of the restrictions assigned by Dr. Anderson.

Just under two years later, Hartford asked Bassham's pain management physician, Dr. Beck, whether Dr. Anderson's lifting restrictions remained appropriate. Specifically, Hartford informed Dr. Beck that "[o]n 6/20/03 a Functional Capacity Evaluation was completed by the patient and it indicated the patient was not able to lift over 20-40 [pounds], as well as reaching.  William Walley, MD confirmed these same restrictions on 7/3/03."[118]  Hartford then asked Dr. Beck whether he concurred with those limitations; and he responded "yes."[119]

Finally, Hartford asked its own consulting physician, Dr. Pick, to review Bassham's medical records and state whether he felt that Dr. Anderson's restrictions were sufficient.[120]  Dr. Pick did not have an opportunity to examine Bassham in person, but he reviewed numerous medical records, and issued a written report

---

[116] AR at 515.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 15.

[117] *See id.*

[118] AR at 486.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶34.

[119] AR at 486.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 35.

[120] AR at 97.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 48.

opining that the restrictions originally established by Dr. Anderson were sufficient.[121]

This veritable consensus of medical opinion is the centerpiece of Hartford's argument in favor of summary judgment.

Bassham, for her part, does not dispute the existence of this consensus. Rather, she argues that these physicians' opinions should be discarded because they all have their roots in Dr. Anderson's *summary* of the FCE — a summary that did not mention the early termination of some lifting exercises. For at least three reasons, however, the court finds that this alleged irregularity does not create a genuine issue of material fact as to whether Hartford's decision to terminate Bassham's benefits was "wrong." First, Dr. Anderson's omission of any reference to the early termination of the lifting exercises in his summary of findings cannot be construed to invalidate his restrictions. Since he certainly would have known of the lifting exercise stoppage at the time he drafted the summary, Dr. Anderson may simply have found it irrelevant.[122] Second, Dr. Walley explicitly acknowledged awareness of the early termination when he endorsed Dr. Anderson's restrictions, evidently considering it a non-issue. Third,

---

[121] AR at 102-03. *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 48.

[122] Furthermore, Dr. Anderson's assessment of Bassham's abilities was not confined to an analysis of her lifting capacity. Based on the FCE, he also concluded (and the other physicians subsequently agreed) that Bassham was capable of, *inter alia*:  walking, balancing, sitting, and standing on a frequent basis; stooping, kneeling, and crouching constantly; occasionally reaching; and carrying, pushing, and pulling between 15 and 30 pounds on a frequent basis. AR at 524. Bassham does not challenge the reliability of the testing that underlies these findings.

*none* of the concurring physicians stated that their validation of the restrictions was based exclusively upon either the June 20, 2003 FCE or Dr. Anderson's summary of its results, rather than upon their own review of Bassham's medical records and condition. This final point is critical, because Bassham also suggests that, by the time Dr. Beck and Dr. Pick issued their concurring opinions in 2005, the June 2003 FCE was outdated. For example, according to Dr. Anderson's summary, on the date of the FCE, Bassham had no shoulder impingement, and no tender points in the cervical and/or thoracic regions.[123] Other documents in the Administrative Record, however, suggest that, by the end of 2003, Bassham suffered from right and left shoulder impingement, and had multiple tender points in the cervical, occipital, and trapezius regions.[124] In May 2004, Bassham was diagnosed with fibromyalgia.[125] The fact remains, however, that both Dr. Beck and Dr. Pick were fully aware of Bassham's contemporaneous condition when each validated Dr. Anderson's restrictions in 2005. Dr. Beck was Bassham's own pain management physician, and was treating her on a constant basis; he also had access to Dr. Anderson's summary, and would have known about any changes in her status. Although Dr. Pick was not Bassham's physician and never evaluated her in person, he considered all medical records

---

[123] AR at 529-30.

[124]*Id.* at 357-59.

[125] *Id.* at 138, 328.

submitted by her through the time of her appeal before deciding that Dr. Anderson's restrictions continued to be appropriate.[126]

In sum, the court concludes that the light- to medium-duty work restrictions initially recommended by Dr. Anderson, and thereafter ratified by Dr. Parker, Dr. Walley, Dr. Beck, and Dr. Pick, clearly support Hartford's decision to terminate Bassham's disability benefits.  Hartford certainly was not "wrong" to rely upon these restrictions.

## 2.    *The Vocational Evaluations and Bassham's Own Assessment of Her Capabilities*

Bassham submitted to several vocational evaluations during the course of this benefits dispute.  The first two evaluations were performed by Raenell May, a

---

[126] Bassham argues that Hartford should have disregarded Dr. Pick's assessment because, as she sees it:  (1) he is not a vocational expert; (2) he did not consider Bassham's medical condition as a whole; and (3) he failed to consider her pain.  The court need not reach these criticisms, for even if Bassham were correct on all counts, the opinions of Dr. Beck and the other physicians would still amply support Hartford's decision to terminate Bassham's benefits.  Nevertheless, she is simply not correct on all counts.  The court agrees that it is important to consider the conclusions of vocational experts — and it will do so in the succeeding section of this opinion — but Dr. Pick manifestly did not attempt to perform a vocational assessment.  His analysis is, quite properly, limited to an "assessment of Ms. Bassham's [medical] condition," and to the question of whether the light- to medium-duty work restrictions were sufficiently protective of her health.  AR at 97.  The court also rejects Bassham's argument that Dr. Pick did not consider her medical condition as a whole.  A review of Dr. Pick's written report clearly establishes that he considered all aspects of Bassham's condition.  Although it is true that Dr. Pick erroneously stated that only one physician had observed asymmetric ankle reflexes, when in fact at least two physicians had documented that finding, *see id.* at 98, 102, 366, Bassham does not explain what significance (if any) this error may have.  Finally, while Bassham suggests that Dr. Pick overlooked her fibromyalgia and other painful conditions, his report explicitly references those matters.  *See id.* at 98-100.

Rehabilitation / Vocational Case Manager employed by Hartford.[127]  As discussed above, after interviewing Bassham and performing a preliminary review of her file in February 2004, May found that Bassham was not able to lift more than 20 to 40 pounds from waist level, and had reach restrictions.[128]  However, she credited Bassham's own statements that she could:  perform household chores (including grocery shopping); drive and walk; tend to her personal hygiene; and use a home computer in 30 minute intervals.[129]  Moreover, May noted that Bassham had a high school education and also completed some college courses.[130]  Based on all of this, May opined that Bassham could successfully perform the duties of a small parts inspector, an office manager, and/or a dispatcher.[131]

Approximately one year later, in February of 2005, May re-interviewed Bassham.  At that time, Bassham stated that she was no longer performing household chores or grocery shopping, and used her home computer only occasionally; further, she stated that she could only walk and drive for short distances.[132]  May recorded this information, consulted the restrictions imposed by Dr. Anderson, and then completed

---

[127] *See* AR at 109 (citing the vocational evaluation as support for the termination of benefits).

[128] *Id*. at 62.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.* at 24.

a full "assessment of employability."[133]  Part of that assessment called for consideration of alternative occupations in "the sedentary-light physical demand category."[134] May vetted possible jobs with the assistance of the Occupational Access System ("OASYS"), "a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations" in the national economy.[135]  In performing the search, "[a]ll jobs were screened to eliminate positions requiring lifting, and reaching."[136]  The OASYS query turned up three occupations within those specifications:  (1) assembly-line inspector in the furniture industry; (2) production-control clerk; and (3) dispatcher clerk in the railroad industry.[137]

Hartford relied upon this assessment in refusing to overturn its original decision terminating Bassham's benefits,[138] but the court is relatively unimpressed with it.  For one thing, May's analysis (if it can be characterized as such) is barely over one page long.  It contains no substantive explanation of how the occupations identified are consistent with Bassham's skills and limitations.  This is especially frustrating because Bassham's personal description of her abilities changed

---

[133] *Id.* at 475.

[134] *Id.* (bracketed text supplied).

[135] *Id.*

[136] *Id.*

[137] *See id.* at 476-85.

[138] *Id.* at 109.

significantly in the time between May's two vocational assessments.  As noted, during the second interview, Bassham stated that she was not even able to perform household chores, or to walk for sustained periods of time, and rarely used her home computer.  May's "assessment of employability" does not take account of those seemingly important lifestyle changes.  Although the three jobs identified in the assessment may in fact be consistent with Bassham's limitations, even a careful reading of the assessment does not make this clear.  Given Bassham's own opinion of her abilities, some indication of whether the proposed jobs require sitting or standing for long periods of time would be helpful, as would some indication of whether extended computer use is required.  The  occupational descriptions for the proposed jobs that are appended to the assessment contain no such indications.  Instead, they are largely limited to a description of the incumbent's responsibilities.  Nor does May's assessment make any reference to Bassham's pain, or the effect thereof on her ability to perform the selected jobs.  Finally, although the vocational evaluation states that the three occupations identified are "prevalent in the geographic area at a gainful wage," no actual *numbers* of such jobs, or a description of where they are located in relation to Bassham's residence, is provided to reinforce May's conclusory assertions.  *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1797 (3d ed. 2002) (defining "prevalent" as "generally or extensively existing").

-38-

Standing in sharp contrast to May's perfunctory assessment is the five-page vocational evaluation performed by Bassham's own expert, Anne Herrington Darnell. As previously explained, Darnell met with Bassham in August 2005.[139]  In the written report produced after that meeting, Darnell referenced Dr. Anderson's restrictions and also discussed in detail Bassham's own assessment of her abilities.  Bassham stated to Darnell that she could lift no more than 10 pounds on an occasional basis, could not stand for more than 20 minutes, could not sit for more than 45 minutes, or walk more than one block, and could not reliably stoop, climb, or bend.[140]  Darnell also devotes several paragraphs in the written report to a discussion of Bassham's pain, and the impact of that pain on her ability to engage in physical activities.[141]  For instance, Darnell notes that Bassham has migraine headaches two to three times a week, of such an intensity that she is forced to "go lie in a dark room."[142]  Subjective complaints of headaches are confirmed through reliance upon the objective findings of Bassham's physicians.[143]  Further, Darnell observes that Bassham "has difficulty dressing due to discomfort," does household chores only "with frequent breaks," and,

---

[139] *Id.* at 151.

[140] *Id.* at 151-52.

[141] *See id.* at 152-53.

[142] *Id.* at 152.

[143] *Id.*

on an average day, "rated her pain as a level of five to seven" on a ten-point scale.[144]
After a comprehensive analysis, Darnell concludes that Bassham "has a Vocational
Disability Rating and Loss of Earning Capacity of 100%."[145]

In announcing its decision regarding Bassham's appeal, Hartford
acknowledges, but then rejects, Darnell's conclusions, ostensibly because "our [*i.e.*,
Hartford's] vocational case manager previously reviewed Ms. Bassham's file using
the same medical and vocational criteria and identified three occupations she would
qualify for based on her education, training and work experience and which would
be within the restrictions and limitations provided by her physician."[146]   As the
foregoing discussion illustrates, however, it is not at all clear that Hartford's case
manager *actually* considered the same medical criteria as Darnell.   Indeed, the only
reference to Bassham's health status in Hartford's internal "assessment of
employability" is the discussion of the lifting and reaching restrictions established by
Dr. Anderson.[147]   This does not adequately account for Bassham's headaches,
inability to walk or sit for long periods, or her pain.   Therefore, Hartford's decision
to reject Darnell's report in favor of its own, less thorough, internal assessment was

---

[144] *Id.* at 153.

[145] *Id.* at 154.

[146] *Id.* at 109.

[147] *Id.* at 475.

at least arguably "wrong."

### 3.    *The Social Security Administration Determination*

Bassham also asks the court to consider the Social Security Administration's decision that she is totally and completely disabled.[148]  There are "critical differences between the Social Security disability program and ERISA benefit plans."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).  For that reason, it is well-established that "benefits determinations by the Social Security Administration are not binding on disability insurers."  *Pari-Fasano v. ITT Hartford Lift & Accident Insurance Co.*, 230 F.3d 415, 420 (1st Cir. 2000).  That said, claims administrators should not "arbitrarily refuse to credit a claimant's reliable evidence."  *Nord*, 538 U.S. at 834.  To ensure that due regard is given to all reliable and relevant evidence, the court may consider a Social Security award.  *See Johnson v. Bellsouth Long Term Disability Plan for Non-Salaried Employees*, No. 05-CV-858-J-32TEM, 2006 WL 2092273, at * 15 (M.D. Fla. 2006) ("While this Court can certainly consider the SSA's determination in reviewing the plan administrator's decision regarding eligibility for benefits under ERISA, such a determination is not dispositive." (internal citations omitted) (citing *Nord*, 538 U.S. at 832-33; *Kirwan v. Marriot Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994)).  *Cf. Scarpulla v. Bayer Corp.*

---

[148] The decision was submitted to Hartford and included in the Administrative Record.

*Disability Plan*, 514 F. Supp. 2d 1262, 1272 (N.D. Ala. 2007) ("Because this court

is not limited to the administrative record at this [the *de novo*] step of its review, the

court properly considers the SSA decision.").

Here, the Administrative Law Judge was presented with many (if not all) of the

same medical records reviewed by Hartford, and also gave serious consideration to

Bassham's complaints of pain.  For example, the Administrative Law Judge noted

that Bassham:

> continues to have neck and upper back pain constantly.  She has
> shooting pain to her right fingers and numbness.  She avoids writing and
> repetitive motion.  After 30 minutes of these types of activities she has
> increased pain.  She has decreased grip strength.  Her neck is sore
> constantly.  She rated her pain as at least a "5" at all times and the pain
> worsens with motion of her arms.  Increased pain causes her to have
> migraine headaches.  She has increased muscle spasms in her back when
> she uses her arms to reach or pull.  She has had two surgeries oh her
> back, which has helped her stability, but she has not had a decrease in
> pain. The pain in her neck and across her buttocks is always there.  She
> has pain and swelling in her legs that increases with sitting.  The pain in
> her back increases from a "3 or 4" to a "5 to 7" with bending, lifting,
> standing, and sitting.  Her muscle spasms also increase.[149]

The court believes this summation of Bassham's testimony before the

Administrative Law Judge is both reliable and highly significant.  In its letter refusing

to overturn the termination of benefits, however, Hartford did little more than gloss

over Bassham's complaints of pain, failing to meaningfully analyze the impact of that

---

[149] AR at 322.

pain on her ability to perform full-time work on a competitive basis.  And the Appeals Specialist who wrote the letter acknowledged receipt of the Social Security decision, but did not make any effort to explain why it was not considered impactful.  Without holding that claims administrators are required to explain why a Social Security Administration decision is deemed unworthy of credit, the court holds that, in this case, the Social Security decision constitutes substantial evidence in support of Bassham's position.  *See*, *e.g.*, *Wise I*, 260 F. Supp. 2d at 1320 (denying summary judgment in part because the claims administrator did not "adequately take into account the determination of the Social Security Administration that Plaintiff is disabled, instead falling back on the unhelpful assertion (for purposes of summary judgment) that such a determination is 'not dispositive'").  When combined with Darnell's vocational evaluation discussed in the previous section of this opinion, the Social Security decision is sufficient to create a genuine issue of material fact as to whether Hartford's termination of Bassham's benefits was "wrong."

## C.    Step Two:  "Reasonable"

Having determined after *de novo* review that Hartford's decision was at least arguably "wrong," the court must next evaluate whether there was, nevertheless, a "reasonable basis" for the decision.  *See Jett*, 890 F.2d at 1139; *HCA*, 240 F.3d at 994.  The court need not tarry long at this step.  Clearly, the unanimous judgment of

all medical professionals in this case that Bassham is capable of performing light- to medium-duty work on a full-time basis supports Hartford's decision to terminate benefits. Further, although the court questions the decision to credit Hartford's internal vocational evaluations over the evaluation that Bassham submitted, the internal assessments do support Hartford's termination decision. *See Rementer v. Metropolitan Lift Insurance Co.*, No. 604CV11480RL22JGG, 2006 WL 66721, at * 1 (M.D. Fla. Jan. 10, 2006) ("[A]n administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable."). This evidence, taken together, provides Hartford with a reasonable basis for terminating Bassham's benefits. *See Wise I*, 360 F. Supp. 2d at 1321.

## D.   Step Three:  Self-Interest

If Hartford were free of any conflict of interests, the court's finding that it had some reasonable basis for its arguably "wrong" decision would necessarily lead to entry of summary judgment in its favor. Here, however, the court has already determined that Hartford operates under a conflict of interests. Therefore, the court proceeds to the third and final step of the inquiry — "heightened" arbitrary and capricious review — and the burden shifts to Hartford to prove that "the undisputed facts support[] a decision that it was not influenced by a conflict." *Doyle*, 511 F.3d at 1344. The court conducts this analysis with a great deal of hesitation, recognizing

that multiple courts, including panels of the Eleventh Circuit, have concluded that this burden-shifting paradigm is flawed, if not entirely unworkable.  *See id*. at 1346 (remarking that "our heightened standard effectively makes the administrator's conflict of interest the dispositive factor, rather than merely 'a factor,' in determining whether its decision was arbitrary and capricious").  *See also Wise I*, 360 F. Supp. 2d at 1322 ("Literal application of the rule . . . becomes hopelessly awkward in [the factual determination] context."); *Barchus v. Hartford Life & Accident Insurance Co.*, 320 F. Supp. 2d 1266, 1289 n.130 (M.D. Fla. 2004) ("The danger here is that a conflicted claims administrator's 'wrong but reasonable' fact-based decision must actually be 'correct' from a *de novo* perspective to avoid being overturned.").

At least two district courts within this Circuit have successfully ameliorated these concerns by employing a standard of objective reliability.   In *Wise I*, for example, the court held that

> a comparative, objective analysis respecting the reliability of the various sources before the administrator at the time it made the disputed decision provides a focal point for the court's review that places upon the conflicted administrator a greater burden than merely showing that its decision was not without *some* reasonable basis, but at the same time, does not demand that the Court actually agree with the decision before it is given deference.

. . . .

Accordingly, the Court concludes that a conflicted plan

-45-

> administrator may carry its burden in a suit challenging a 'wrong but reasonable' factual determination if it can demonstrate that the opinions and evidence it relied on [in] denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it.

*Wise I*, 360 F. Supp. 2d at 1322-23 (emphasis in original) (bracketed text supplied).

Likewise, in *Fick v. Metropolitan Life Insurance Co.*, 347 F. Supp. 2d 1271 (S.D. Fla. 2004), the court identified a number of factors to consider at the heightened review stage, but focused on the weight of the "objective medical evidence." *Id.* at 1286. The court held that "[c]ase law supports the conclusion that it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement." *Id*. By that same token, the court emphasized that "[t]he exact nature of information considered by the fiduciary may be relevant if it indicates that the fiduciary ignored pertinent evidence, which suggests that the decision was motivated by self-interest." *Id*.

This court is persuaded that the foregoing analysis strikes the proper balance, enabling heightened judicial scrutiny of a conflicted administrator's decision, while also ensuring that the conflict itself is not the sole factor to be considered. Applying this standard to the case at hand, the court concludes that genuine issues of material fact preclude the entry of summary judgment in Hartford's favor. On the one hand,

Hartford has presented the court with a united front of reliable medical opinion: every doctor who was asked concluded that Bassham is capable of performing light-to medium-duty work on a full-time basis. On the other hand, Hartford expressly rejected what appears to be a very well-researched vocational evaluation concluding that Bassham simply could not compete for jobs in the open market. The only explanation given for this rejection was that Hartford's internal vocational evaluation conflicted with the one submitted by Bassham. Since Hartford did not actually find any *fault* with the external evaluation, its decision to discard it in favor of its own implies bias. This implication of bias is even more suspicious given the court's conclusions that the internal evaluation fails to account for Bassham's pain and objectively verified pain-causing conditions (*e.g.*, fibromyalgia, radiculopathy), fails to address how the responsibilities that inhere in the jobs identified comport with Bassham's abilities, and fails to substantiate the statement that the jobs identified are "prevalent" in the relevant community. Similarly, Hartford's failure to even analyze the relevance of the Social Security Administration decision also arguably implies a disinterest in contrary conclusions. *See Wise I*, 360 F. Supp. 2d at 1326 (indicating that Social Security awards may be persuasive evidence of disability).

In other words, Hartford has failed to affirmatively demonstrate that the evidence it credited was "at least as objectively reliable as the countervailing opinions

and evidence then before it." *Wise I*, 360 F. Supp. 2d at 1323.  Moreover, it appears that Hartford "ignored pertinent evidence, which suggests that the decision was motivated by self-interest." *Fick*, 347 F. Supp. 2d at 1286.  Therefore, the motion for summary judgment will be denied.[150]

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 26th day of February, 2008.

United States District Judge

---

[150] Defendants also argue that they are entitled to summary judgment on estoppel grounds. They point out that Bassham also brought a claim for retaliation under ERISA after PPG terminated her from employment.  In her deposition, taken in connection with that claim, Bassham testified about a meeting between her and PPG officials in September of 2003.  At the meeting, Bassham allegedly requested that PPG accommodate her disability by allowing her to come back to work at another position at the plant.  Defendants interpret this request as a tacit concession that Bassham was in fact capable of performing "any occupation," and, accordingly, argue that she should be estopped from now contending otherwise.  The court has reviewed the deposition, and has also considered Bassham's affidavit, which defendants cite as additional support for their estoppel argument.  Neither of those sources of testimony clearly establish that Bassham attempted to return to PPG subsequent to September or October of 2003.  Because there is evidence that Bassham's physical condition deteriorated as time went on, the fact that she was willing to return to work in 2003 (when the "own occupation" definition of disability still controlled) is irrelevant. Consequently, the court will not apply the estoppel doctrine to preclude her from seeking disability benefits.